**Majority Panel Opinion of July 16, 2019 and Dissenting Panel Opinion of September 24, 2019 Withdrawn; Affirmed in Part, Reversed and Rendered in Part, and Reversed and Remanded in Part and En Banc Majority and Dissenting Opinions filed March 31, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00062-CV

## IN THE INTEREST OF L.C.L. AND M.E.M., CHILDREN

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2016-03785J**

### DISSENTING  OPINION

We dissent from the majority's analysis and conclusions regarding the trial court's endangerment and best-interest findings. In concluding the evidence is legally insufficient to support the trial court's findings of endangerment, the majority fails to follow binding high court authority. In overruling the precedent of this court, the majority creates a conflict between this court and the other 13 courts of appeals in Texas. And, in concluding the evidence is factually insufficient to support the trial

court's best-interest finding, the majority fails to fulfill the constitutional role of an appellate court to give due deference to the factfinder's credibility determinations. This court should affirm, not reverse, the trial court's judgment.

## BACKGROUND

The Department filed an original petition to terminate Mother's parental rights based on suspected neglect of the children and Mother's illegal drug use. The children were initially removed based on reports of suspected child neglect and Mother's positive drug test. Trial began one and a half years later. Mother was present for the first day of trial and the court noted on the record that Mother had the benefit of a Spanish language interpreter for trial. Mother's attorney spoke Spanish as did the attorney ad litem appointed to represent the children. Each time the children's ad litem spoke with Mother, they spoke in Spanish. The Department requested that trial begin that day and asked the trial court to recess for the parties to return to mediation. The Department also requested a permanency hearing. No party objected to the proposed recess and permanency hearing.

Victoria Palmer, the caseworker, testified that the children were placed in foster care that was meeting their physical and emotional needs. At the beginning of Palmer's testimony the trial court admitted a permanency report without objection. Palmer prepared the report for purposes of the permanency hearing.

The permanency report stated that the Department had completed family service plans for Mother, three fathers, and an unknown father. As to Mother, the report noted that Mother had completed the tasks of signing a release of confidential information to permit providers to obtain past medical and mental health information. The report further noted that Mother was living with her older child and had provided proof of residence. Mother also had provided proof of employment. Mother had avoided criminal activity.

2

*Mother's Failure to Complete Psychosocial Assessments, Evaluator Recommendations, and Parenting Classes*

With regard to other requirements of the service plan the report noted that Mother was required to complete a psychosocial assessment conducted by the Children's Crisis Care Center and follow all recommendations made by the evaluator. Mother was referred to the Children's Crisis Care Center on July 8, 2016, and to a facility called "All Things Matter Inc." on October 5, 2017. Mother had not completed this requirement. As to required parenting classes Mother had been referred to five facilities. At the time of the report Mother had not completed parenting classes.

*Mother's Failure to Complete Substance-Abuse Services and Her Positive Test Results from Random Drug Screenings*

The service plan also required Mother to demonstrate an understanding of the adverse effects of substance abuse on herself and her children and she was referred to substance abuse services and counselors. Mother was referred to an individual counselor on October 17, 2016, and was referred to the Wellness Counseling Center on October 21, 2017, and again on November 8, 2017. Mother failed to appear for a scheduled appointment at the Wellness Counseling Center on October 21, 2017. No other appointment was noted in the permanency report. Mother was also referred to Hope Recovery Services. No appointments were listed for Hope Recovery Services. The service plan also required Mother to submit to random drug screenings throughout the case. Mother did not attend all of the required drug screenings.

The permanency report admitted into evidence on the first day of trial also listed the following drug screenings and the results for Mother:

- 10/7/16 – (Facility Closed early)
- 10/19/16 – (Computers crashed at facility) [Mother] was also late and therefore results in a POSITIVE.

3

- 11/4/16 – Hair – POSITIVE; Cocaine 915mg; Marijuana 1 mg
- 11/9/ 16 – Urine – POSITIVE; No Show
- 11/29/16 – Hair – POSITIVE; No Show
- 12/9/16 – Hair – POSITIVE; No Show
- 12/21/16- Urine – POSITIVE; No Show
- 1/13/17 – Hair – POSITIVE; No Show
- 1/31/17 – Urine – [no notation in document]
- 2/ 16/17 – Hair – POSITIVE; No show
- 2/28/17 – Urine – POSITIVE; No show
- 3/10/17 – Urine – POSITIVE; No show
- 3/24/17 – Hair – POSITIVE; No show
- 4/6/17 – Hair – POSITIVE; No show
- 4/26/17 – Hair – POSITIVE; No show
- 5/6/17 – Hair – POSITIVE; No Show
- 7/12/17 – Hair – POSITIVE; No show
- 8/10/17 – Hair/UA – POSITIVE; No Show
- 9/18/17 - Hair/UA – POSITIVE; No Show
- 10/5/17 – Hair/UA – POSITIVE; No Show - Court Ordered
- 10/27/17 – Hair/UA – Facility closed.
- 11/1/17 – Hair – POSITIVE, Cocaine 3378 Marijuana .3
- 11/8/17 – UA, NEGATIVE
- 11/8/17 – Hair, PENDING

The report noted that Mother "understands that if she fails to submit a specimen for testing on that day, [t]he Department will determine the result is POSITIVE." The report further noted Mother "understands failure to submit random urine specimens when requested, positive urine samples, or altered/diluted samples can result in suspension of visitation with her child[ren]."

At the end of the hearing the Department requested that Mother submit to a

drug screening that day. The trial court ensured that Mother understood the importance of cooperation with drug testing and compliance with the family service plan. The trial court explained that failure to comply with testing and the plan could result in restriction or termination of Mother's parental rights. Mother stated on the record that she understood the importance of the plan and that she knew how to contact her caseworker and her lawyer if she needed assistance with compliance.

Palmer testified that Mother had been "very infrequent" with drug testing and had failed to submit to several requests for random drug screening. The Department stopped Mother's visitation with the children in May 2018 because she continued to test positive for cocaine and marijuana. According to Palmer Mother had been unable to show that she could provide the children with a safe and stable environment.

Palmer further testified that Mother had five positive tests over the course of the termination proceeding, not including failures to appear. To Palmer's knowledge, Mother never participated in treatment for drug addiction. Palmer testified that Mother had a history of drug use and that Palmer explained to Mother the importance of her participation in drug addiction treatment. Mother's usage of cocaine and marijuana, as measured by the positive drug tests, fluctuated, sometimes going up and other times going down. The results did not show a steady decline. Mother had at least two negative drug tests but tested positive on subsequent tests. In Palmer's opinion Mother's drug use placed the children in conditions that endangered their safety and their physical and emotional wellbeing. Palmer testified that the endangerment caused by Mother's drug use was reflected in the condition in which the children were found when they came into care.

*Mother's Failure to Attend Permanency Conferences, Court Hearings, and Family Visits*

The report noted that Mother was required to actively participate in all permanency conferences, court hearings, family visits, and activities for her children. Mother had not complied with this requirement because she had not attended all permanency conferences or court hearings. Mother did not attend family visits. Mother was further required to visit her children at the Department's office twice per month. Mother had missed two visits with her children.

*Children's Diagnoses of Suspected Child Neglect, Disorders, and Impairments*

The permanency report contained results of psychological and psychiatric evaluations performed on the children shortly after their removal. The evaluation of Lorenzo revealed diagnoses of suspected child neglect, mild intellectual disability, specific learning disorders with impairments in reading, written expression, and mathematics, adjustment disorder with mixed anxiety and depressed mood, insomnia disorder, and nighttime bed-wetting. Recommendations for Lorenzo included individual therapy, a bedwetting alarm kit, continued Medicaid, and meeting with the school guidance counselor to assess progress and intellectual disability.

The evaluation of Melissa revealed diagnoses of adjustment disorder with mood conduct, communication disorder, child neglect, upbringing away from parents, disruption of family by separation or divorce, and encounter with mental health services for a victim of child neglect. Recommendations for Melissa included keeping her in a stable, predictable, and nurturing environment, thorough speech and language evaluation, encouragement by a caregiver to develop language skills and engage her in developmental activities, closely monitor behavioral and emotional functioning, and regular medical and dental exams with updated immunizations. The

report also encouraged continuation with the Department's visitation agreement.

*Children's Foster-Care Placement*

Palmer testified that both children were living in a foster home together. Lorenzo had behavior issues when first moving into the foster home, but after being reunited with his sister his behavior improved. Both children's academic performance improved while in foster care. Palmer testified that the foster home met all of the children's physical and emotional needs. The long-term goal for the children was adoption. The Department requested recess of trial at that time so the parties could return to mediation in an attempt to reach an equitable settlement.

Trial was recessed and did not resume until May 2, 2018. The testimony on that date centered on the Department's efforts to locate and serve the fathers of the children. Mother testified, giving information about the fathers' whereabouts. Mother testified that she had given the information to the caseworker at the beginning of the case. According to the fathers' attorneys this information was new, and a recess was granted to allow location of the fathers and service of the termination petition on them. Trial resumed on October 30, 2018, with a Harris County Police investigator's testimony about his unsuccessful attempts to locate and serve one of the fathers. When trial resumed after a lengthy break, the trial court admitted several documents into evidence without objection. Those documents included a permanency hearing report dated October 6, 2017. In that report the trial court found that the Department needed to review the family service plan with Mother and her attorney before a final order could be rendered. Also admitted were several drug screening reports for Mother, which included positive results for cocaine and marijuana in Mother's hair collected May 26, 2016 but negative results in a urine analysis. Also admitted was a document from the National Screening Center reporting that on October 6, 2017, Mother was ordered to submit to hair and

urine drug screening but walked out of the facility before a sample could be taken.

Palmer resumed her testimony and reported that the children had been moved to another foster home, which was an adoptive placement. The children moved to that foster home October 5, 2018, 25 days before trial resumed. Although the children had been living in the foster home for only 25 days at the time of the October hearing, they had gone on "a few transition visits" before moving to the foster home. The children were "fully transitioned" into the foster home. The foster home was meeting all of the children's needs, and both children expressed desires to stay in the home and be adopted by the foster parents. Palmer testified that permanency was important for the children and having them in foster care rather than a permanent home for the previous two years was not in their best interest.

*Children's Circumstances under Mother's Care*

Palmer testified that at the time the children came into the Department's care they had been left alone for three days with no food or water found in the home. Lorenzo, six years old at the time, was not enrolled in school. After coming into the Department's care Lorenzo had to repeat first grade twice, and at the time of trial, was still "very behind" in school. Mother contradicted Palmer's testimony about why the children came into the Department's care, testifying, "That's all a lie." Mother testified there was food in her home at the time the children were removed, and she had never lost electricity in her home.

*Mother's Failure to Maintain Contact with the Children*

Palmer testified that Mother had not maintained significant contact with the children. From October 10, 2016 through May 2018, Mother visited the children monthly, missing two visits during that time period. Mother testified that she missed one visit because she did not have transportation and missed another visit because

she was not notified in time to ask for time off from work. Mother testified she had been trying to visit her children since May 2018 by writing to Palmer. Mother admitted that Palmer told her she could not visit the children because of her positive drug tests.

*Mother's Ongoing Failure to Meet Service Plan Requirements*

Palmer testified that Mother had completed a substance abuse assessment on November 9, 2017 and a psychosocial evaluation on February 2, 2018 as well as parenting classes. But Mother failed to satisfy key components of the service plan. Palmer explained to Mother the importance of complying with the service plan and referred Mother to service providers to aid in completion of the plan. Palmer testified that Mother told her she understood the importance of the plan, but Palmer testified she did not think Mother fully understood the consequences of non-compliance. Mother failed to maintain stable housing or stable employment, attend domestic violence classes, or complete the recommendations from her psychosocial evaluation. The recommendations from the substance-abuse assessment included individual and group substance-abuse counseling. Despite the Department's efforts to arrange service providers, Mother did not attend individual therapy or substance-abuse counseling.

When asked about Mother's housing Palmer testified that at one home visit the children did not have proper bedding. The home had only two mattresses; one for Mother and one for the oldest daughter, who lived in the home at that time. There was no place for the younger children to sleep. Mother failed to provide Palmer with a copy of a lease agreement as required by the family service plan. Palmer testified that every time she visited Mother's apartment there was electricity.

Palmer testified that it was her personal and professional opinion that a parent's consumption of illegal drugs was not good for the health or welfare of the children. Palmer acknowledged that she had not observed any instance in which Mother used illegal drugs in the children's presence and she could point to no "specific act where the children were specifically placed in danger because of the use of drugs by [Mother]."

Mother admitted she tested positive for cocaine and marijuana but denied use of those illegal drugs at the time she tested positive. Contradicting her own testimony, Mother also testified that the test results were accurate. Mother admitted using cocaine five or six months before trial and testified that she had never used marijuana. Mother testified that any positive test results for marijuana were false. Mother acknowledged a positive hair test for cocaine and marijuana on November 1, 2017, and a positive hair test for cocaine on November 8, 2017. Mother admitted not appearing for drug screenings on June 7, 2018, July 17, 2018, and September 5, 2018. Each of those missed tests was scheduled during the time that Mother's visitation with her children was suspended due to a positive drug test in May 2018. Mother testified that she did not appear for the September 5, 2018 drug test because she had lost her passport. Mother did not explain why the loss of her passport caused her to miss the drug screening test nor did she explain the reason she missed the June and July tests.

Despite a positive test for cocaine in May 2018, Mother denied using cocaine at that time or in the two months before that test. Mother admitted there had been several times she was asked to submit to drug tests, but she did not appear.

Mother explained her positive drug tests in 2016 and 2017 were a result of depression because she had moved and did not have her children. Since that time

Mother testified she had started working, obtained stable housing, started going to school and church and was "staying away from drugs." Mother admitted she had not provided information about her school attendance to Palmer because she had been going to school for only one month. Mother denied being a regular cocaine user, explaining she used "once per month, sometimes once every two months." Mother denied using cocaine in front of her children. Despite her claims of not being a regular user, Mother agreed that she would benefit from outpatient treatment for cocaine use. Mother testified that no one with the Department ever explained treatment options to her.

When trial resumed on November 27, 2018, Mother admitted she began using drugs two years earlier. Mother initially denied using cocaine and testified that she did not know what drugs were. Mother admitted taking pills "that came out on the test showing that I have cocaine." Contradicting her earlier testimony, Mother testified that her "sober date" was October 2017. Mother also admitted she had testified earlier that she used cocaine as late as 2018. Mother testified that she had used pills containing cocaine in 2018. Mother agreed that it was "harmful to raise children when you are using or taking pills that have cocaine in them." Mother testified that she began attending drug treatment classes on November 14, 2018, almost a year after trial began, and two weeks before trial concluded.

## ANALYSIS

### I. Endangerment Finding

Evidence that a parent used illegal drugs during an ongoing termination suit, when she knows she is at risk of losing her children, is legally sufficient to support an endangerment finding under section 161.001(b)(1)(E) of the Family Code. *In re J.O.A.*, 283 S.W.3d 336, 345 (Tex. 2009); *see also In re G.C.*, No. 14-18-01114-CV, 2019 WL 2063038, at *7 (Tex. App.—Houston [14th Dist.] May 9, 2019, pet.

11

denied) (mem. op.).

In holding the evidence in this case is legally insufficient to support the trial court's finding of endangerment, the majority ignores binding precedent from the Supreme Court of Texas,[1] overrules almost a decade of authority from this court,[2] and creates a conflict with every other intermediate court of appeals in Texas.[3]

---

[1] *In re J.O.A.*, 283 S.W.3d at 345.

[2] *In re K.J.B.*, No. 14-19-00473-CV, 2019 WL 5704317, at *7 (Tex. App.—Houston [14th Dist.] Nov. 5, 2019, no pet. h.) (mem. op.); *In re B.G.G.*, No. 14-19-00278-CV, 2019 WL 2536634, at *8 (Tex. App.—Houston [14th Dist.] June 20, 2019, no pet.) (mem. op.); *In re A.G.*, No. 14-18-01089-CV, 2019 WL 2385723, at *4 (Tex. App.—Houston [14th Dist.] June 6, 2019, pet. denied); *In re A.D.M.*, No. 14-18-01088-CV, 2019 WL 2097922, at *6 (Tex. App.—Houston [14th Dist.] May 14, 2019, pet. denied) (mem. op.); *In re G.C.*, 2019 WL 2063038, at *7; *In re J.J.L.*, 578 S.W.3d 601, 611 (Tex. App.—Houston [14th Dist.] 2019, no pet.); *In re A.R.G.*, No. 14-18-00952-CV, 2019 WL 1716262, at *7 (Tex. App.—Houston [14th Dist.] Apr. 18, 2019, no pet.) (mem. op.); *In re M.M.*, No. 14-18-00881-CV, 2019 WL 1387964, at *7 (Tex. App.—Houston [14th Dist.] Mar. 28, 2019, no pet.) (mem. op.); *In re Z.J.B.*, No. 14-18-00759-CV, 2019 WL 347474, at *5 (Tex. App.—Houston [14th Dist.] Jan. 29, 2019, pet. denied) (mem. op.); *In re D.I.L.-M.*, No. 14-18-00526-CV, 2018 WL 6318422, at *5 (Tex. App.—Houston [14th Dist.] Dec. 4, 2018, pet. denied) (mem. op.); *In re C.W.*, No. 14-18-00427-CV, 2018 WL 5914556, at *6 (Tex. App.—Houston [14th Dist.] Nov. 13, 2018, no pet.) (mem. op.); *In re C.D.G.*, No. 14-17-00261-CV, 2017 WL 4320176, at *6 (Tex. App.—Houston [14th Dist.] Sept. 28, 2017, pet. denied) (mem. op.); *In re E.R.W.*, 528 S.W.3d 251, 264 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re C.A.L.H.*, No. 14-16-00899-CV, 2017 WL 830495, at *5 (Tex. App.—Houston [14th Dist.] Feb. 28, 2017, pet. denied) (mem. op.); *In re D.M.M.*, No. 14-16-00664-CV, 2017 WL 61847, at *5 (Tex. App.—Houston [14th Dist.] Jan. 5, 2017, pet. denied) (mem. op.); *In re M.G.*, No. 14-15-00644-CV, 2015 WL 9241300, at *8 (Tex. App.—Houston [14th Dist.] Dec. 15, 2015, no pet.) (mem. op.); *In re L.E.R.*, No. 14-15-00205-CV, 2015 WL 3918062, at *6 (Tex. App.—Houston [14th Dist.] June 25, 2015, no pet.) (mem. op.); *In re J.J.G.*, No. 14-15-00094-CV, 2015 WL 3524371, at *5 (Tex. App.—Houston [14th Dist.] June 4, 2015, no pet.) (mem. op.); *In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *9 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.); *In re S.R.*, 452 S.W.3d 351, 362 (Tex. App.—Houston [14th Dist.] 2014, pet. denied); *In re R.E.T.R.*, No. 14-13-00640-CV, 2013 WL 6506689, at *4 (Tex. App.—Houston [14th Dist.] Dec. 10, 2013, no pet.) (mem. op.); *In re C.J.S.*, 383 S.W.3d 682, 689 (Tex. App.—Houston [14th Dist.] 2012, no pet.); *In re A.H.A.*, No. 14-12-00022-CV, 2012 WL 1474414, at *7 (Tex. App.—Houston [14th Dist.] Apr. 26, 2012, no pet.) (mem. op.).

[3] *See, e.g., In re C.H.*, No. 09-19-00170-CV, 2019 WL 5243162, at *5 (Tex. App.—Beaumont Oct. 17, 2019, pet. denied) (mem. op.); *In re L.C.*, No. 12-19-00137-CV, 2019 WL 4727826, at *4 (Tex. App.—Tyler Sept. 27, 2019, no pet.) (mem. op.); *In re C.D.L.R.*, No. 13-19-00008-CV, 2019 WL 2608776, at *6 (Tex. App.—Corpus Christi June 26, 2019, no pet.) (mem. op.); *A. C. v. Texas Dep't of Family & Protective Services*, 577 S.W.3d 689, 699 (Tex. App.—

The evidence detailed above reflects credible evidence from which the trial court reasonably could conclude that Mother's cocaine and marijuana use was more than an isolated act and instead was voluntary, deliberate, and a conscious course of conduct.

## II. Family Service Plan

In section IV of its opinion, the en banc majority addresses an issue neither party raised at trial or on appeal: the Department's failure to comply with Family Code section 263.102. Section IV of the en banc majority is advisory and confusing. Mother did not raise the issue of compliance with section 263.102 in the trial court; therefore, Mother waived this issue for appellate review. *See Thota v. Young*, 366 S.W.3d 678, 679 (Tex. 2012); Tex. R. App. P. 33.1. Moreover, Mother did not assign error on appeal to the Department's failure to give her a service plan in a language she understands. We are therefore prohibited from addressing this issue. *See Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex. 1986) (holding that "the court of appeals may not reverse a trial court's judgment in the absence of properly assigned error").

## III. Best Interest of the Children

The majority correctly concludes that the evidence is legally sufficient to

Austin 2019, pet. denied); *In re N.J.H.*, 575 S.W.3d 822, 832 (Tex. App.—Houston [1st Dist.] 2018, pet. denied); *In re M.D.P.*, No. 11-18-00146-CV, 2018 WL 6053931, at *2 (Tex. App.—Eastland Nov. 20, 2018, no pet.) (mem. op.); *In re T.B.*, No. 10-18-00247-CV, 2018 WL 5049062, at *2 (Tex. App.—Waco Oct. 17, 2018, no pet.) (mem. op.); *In re J.L.C.*, 582 S.W.3d 421, 433 (Tex. App.—Amarillo 2018, pet. ref'd); *In re K-A.B.M.*, 551 S.W.3d 275, 285 (Tex. App.—El Paso 2018, no pet.); *In re K.B.*, No. 05-17-00428-CV, 2017 WL 4081815, at *4 (Tex. App.—Dallas Sept. 15, 2017, no pet.) (mem. op.); *In re M.C.*, 482 S.W.3d 675, 685 (Tex. App.—Texarkana 2016, pet. denied); *In re G.C.D.*, No. 04-14-00769-CV, 2015 WL 1938435, at *3 (Tex. App.—San Antonio Apr. 29, 2015, no pet.) (mem. op.); *In re M.D.*, No. 02-14-00305-CV, 2015 WL 729506, at *4 (Tex. App.—Fort Worth Feb. 19, 2015, no pet.) (mem. op.); *In re M.E.-M.N.*, 342 S.W.3d 254, 263 (Tex. App.—Fort Worth 2011, pet. denied); *In re S.N.*, 272 S.W.3d 45, 52 (Tex. App.—Waco 2008, no pet.).

support the predicate finding that Mother failed to comply with the family service plan for reunification under section 161.001(b)(1)(O) of the Family Code. The majority also correctly concludes the evidence is legally sufficient to support the trial court's finding that terminating Mother's rights is in the children's best interest. The majority correctly recites the standard of review under the clear-and-convincing evidentiary standard. However, in an effort to reach its desired result, the majority fails to give due deference to the trial court's fact-finding function.

In announcing the clear-and-convincing evidentiary standard, the supreme court stated, "We emphasize that, as appellate courts apply the standard we announce today, they must maintain the respective constitutional roles of juries and appellate courts." *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002). The court further noted, "An appellate court's review must not be so rigorous that the only factfindings that could withstand review are those established beyond a reasonable doubt." *Id.*

When reversing a termination of parental rights on factual insufficiency grounds, the reviewing court must detail the evidence relevant to the issue of parental termination and clearly state why the evidence is insufficient to support a termination finding by clear and convincing evidence. *In re C.H.*, 89 S.W.3d at 28–29. In its factual sufficiency review, the majority fails to do so.

The *Holley* best interest factors are: (i) the children's desires, (ii) the children's needs now and in the future, (iii) danger to the children now and in the future, (iv) the parent's parental abilities, (v) the programs available to assist the parent promote the children's best interest, (vi) the plans for the children by the parent or the agency seeking custody, (vii) the stability of the home or proposed placement, (viii) the parent's conduct indicating that the relationship is not a proper one, (ix) any excuse for the parent's conduct, and (x) any other relevant consideration. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).

14

The Family Code also identifies factors the court may consider in evaluating a parent's willingness and ability to provide the child with a safe environment. Tex. Fam. Code Ann. § 263.307(b). Evidence supporting the statutory predicate of termination is relevant to the best-interest analysis. *In re E.R.*, 555 S.W.3d 796, 809 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

The majority finds no evidence of the following six *Holley* factors: the present and future emotional and physical danger to the children; the parental abilities of the persons seeking custody; the programs available to assist those persons seeking custody in promoting the best interest of the children; and acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate. The majority ignores evidence of acts or omissions by the Mother and, thus, concludes there is no evidence of an excuse for any acts or omissions as considered in factor nine. Finally, the majority determines the record contains only minimal evidence of factors six and seven — the plans for the children by the individuals or agency seeking custody, and the stability of the home or proposed placement. The majority concludes that the record contains minimal evidence to support certain factors, but the majority fails to weigh the evidence both in favor of and against the best interest of the children. The majority does not address the statutory best-interest factors.

A finding in support of best interest does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d. at 371–72. The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d 624, 631 (Tex. 2018). Keeping this child-centered focus in mind, we address the applicable factors in turn looking at the evidence that supports the trial court's finding in addition to evidence that does not support the finding.

## A. Desires of the Children

The children were eight and six years old at the time of trial. Palmer testified that both children were in the same foster home and the foster parents were meeting all of the children's physical and emotional needs. The foster parents were willing to adopt both children. According to Palmer both children wanted to stay in the foster home and had expressed desires to be adopted by their foster parents.

The majority dismisses this factor because it does not achieve the desired result, noting that Palmer's testimony is "the only evidence adduced at trial regarding factor one." While this may be the only evidence of the children's desires, it is probative evidence that must be considered in a factual sufficiency review. This court cannot ignore evidence the trial court heard simply because it is the only evidence of a factor. *See In re C.H.*, 89 S.W.3d at 28–29. The majority has not identified evidence of the children's desires that contradicts Palmer's testimony or the trial court's finding.

## B. Present and Future Physical and Emotional Needs of the Children

This court's analysis of the present and future physical and emotional needs of the children must focus on the children's innate need for permanence. *See In re D.R.A.*, 374 S.W.3d 528, 533 (Tex. App.—Houston [14th Dist.] 2012, no pet.).

All children have physical and emotional needs that must be met on a daily basis. Some, like Lorenzo, may have needs requiring extra care. Lorenzo suffers from adjustment disorder with mixed anxiety and depressed mood, insomnia disorder, and nighttime bed-wetting. He has been diagnosed with mild intellectual disability and learning disorders. The evidence showed that while in his Mother's care, Lorenzo had impairments in reading, written expression, and mathematics. He was not enrolled in school at the time he was removed from Mother's home. Lorenzo

was so behind academically that he had to repeat first grade twice.[4]

The record reflects that at the time of removal the children were not in a safe stable home. Like Lorenzo, Melissa was experiencing adjustment disorder. She had been diagnosed with mood conduct and an unspecified communication disorder. The children's special needs make them more vulnerable and magnify the need for a safe environment.

A pattern of illegal drug use by the parent suggests that the parent is "not willing and able to provide the child with a safe environment—a primary consideration in determining the child's best interest." *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.); *see In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.) ("A parent's drug use supports a finding that termination is in the best interest of the child."). Mother's history of illegal drug use and her unwillingness to seek treatment is relevant to physical danger to the children. *See Holley*, 544 S.W.2d at 372 (listing current and future physical danger to child as factors relevant to best-interest determination); *In re E.R.W.*, 528 S.W.3d at 266 ("Mother's history of drug abuse bespeaks a course of conduct that the fact finder reasonably could conclude endangers [the child's] well-being."); *see also* Tex. Fam. Code Ann. § 263.307(b)(8) (considering whether children's family has history of substance abuse).

This is not a case where the parent has experienced positive drug tests but has expressed a desire to seek treatment for drug abuse. In this case Mother's story of

---

[4] The majority accuses us of "fundamentally misstat[ing] evidence in the record" by presuming the caseworker's testimony was "correct regarding Lorenzo not being enrolled in school at the time of the removal, when, in fact, there is evidence in the Department's initial evaluation that Lorenzo was enrolled in a school." In engaging in the constitutional role of an appellate court, we do not engage in credibility determinations or weigh evidence or the lack of evidence in considering whether the evidence supports the trial court's findings. It is not a misstatement of evidence to presume that a witness's testimony is accurate.

17

drug use changed every time she was asked about it at trial. Mother admitted drug use at times but also denied it at times. Over the course of two years, knowing she must submit to drug testing and complete her service plan to obtain the return of her children, Mother continually failed to appear for scheduled drug screenings. Mother failed to visit her children after testing positive for illegal drugs in May 2018. Mother knew she could visit the children if she submitted to drug screening and tested negative, but Mother chose not to submit to drug testing while the termination case was pending. Mother chose to continue using drugs rather than to seek help for her drug use, fully understanding she risked losing her children if she made that choice.

Mother contends that she was "never given a 'family service plan', that none of the 'family service plans' were actually signed by her or show a date upon which they were given to her and none were in the Spanish language." Even accepting this statement as true, the record reflects that on December 11, 2017, over a year before the final order of termination, the trial court instructed Mother on the record:

> [P]lease continue to be aware that in a case like this, if a parent doesn't successfully complete a family service plan, the consequences could include the State; lawyers for children; guardians for children coming back and asking the Court to consider continuing to restrict a parent's rights, that's happened in this case on a temporary basis, or in a proper case terminating a parent's rights.

The trial court asked Mother whether she understood its instruction and Mother replied, "yes." This evidence is clear and direct. There is no question that Mother understood exactly what she was supposed to do.

This evidence also weighs against Mother under the eighth, eleventh, and twelfth statutory factors, which consider whether Mother has a history of substance abuse, whether Mother is willing and able to effect positive environmental and personal changes within a reasonable period of time, and whether Mother

demonstrates adequate parenting skills. Tex. Fam. Code Ann. § 263.307(8), (11), (12).

## C.    Acts or Omissions of the Parent that May Indicate the Existing Parent-Child Relationship is Not Appropriate

Mother's inability to provide a safe home or enroll Lorenzo in school, especially given the child's learning disabilities and special needs, also supports the trial court's best-interest determination. *See In re M.R.*, 243 S.W.3d 807, 821 (Tex. App.—Fort Worth 2007, no pet.); *see also In re S.R.*, 452 S.W.3d at 366 (the fact finder may infer from past conduct endangering the children's well-being that similar conduct will recur if the children are returned to the parent).

The record shows that Mother tested positive on several drug tests and failed to complete at least 16 scheduled drug screenings during the pendency of the underlying suit to terminate parental rights. Additionally, Mother did not take advantage of opportunities and services provided by the Department to treat her substance abuse. A court may consider whether a parent demonstrated willingness to effect positive environmental and personal changes within a reasonable amount of time. *See* Tex. Fam. Code Ann. § 263.307(b)(11). Mother failed to demonstrate such a willingness.

## D.    Parental Abilities of Those Seeking Custody, and Stability of the Home or Proposed Placement

The factors concerning the parental abilities of those seeking custody, and the stability of the home or proposed placement compare the Department's plans and proposed placement of the children with the plans and home of the parent seeking to avoid termination. *See In re D.R.A.*, 374 S.W.3d at 535.

Palmer testified that both children were in the same foster home with parents that were meeting their physical and emotional needs. The foster parents were

willing to adopt both children and the children expressed desires to stay with the foster parents and be adopted by them.

On the other hand, the record contains no evidence suggesting that Mother would be able to provide a long-term safe and stable environment. Nor does the record show that Mother has an appreciation for the children's noted disorders and disabilities or that Mother understands how those conditions impact her children's growth and development. No evidence suggests Mother recognizes the importance of addressing her children's special needs or the consequences of not getting them the help they need. The record evidence does not show that Mother has met the children's special needs in the past, that Mother would be able to provide for the children's special needs in the future, or that Mother would take the necessary action to seek services to address the children's needs for treatment, therapy, and other support. *See In re J.S.*, No. 14-18-00709-CV, 2019 WL 438821, at *8 (Tex. App.—Houston [14th Dist.] Feb. 5, 2019, pet. denied) (mem. op.).

Mother's long-term and ongoing drug use and its effect on her ability to parent qualifies as an endangering course of conduct and supports a finding that termination of parental rights is in the best interest of the children. *See In re Q.M.*, No. 14-17-00018-CV, 2017 WL 1957746, at *11 (Tex. App.—Houston [14th Dist.] May 11, 2017, pet. denied) (mem. op.); *In re A.C.*, 394 S.W.3d 633, 642 (Tex. App.—Houston [1st Dist.] 2012, no pet.).

### E. Programs available to assist in promoting the children's best interest

In determining the best interest of the children in proceedings for termination of parental rights, the trial court properly may consider that the parent did not comply with the court-ordered service plan for reunification with the child. *See In re E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013). The majority finds legally and factually sufficient

20

evidence to support the trial court's finding that Mother failed to comply with the court-ordered family service plan.

Mother acknowledged on the first day of trial that she had been provided a family service plan to obtain the return of her children. Mother further acknowledged that those requirements included abstaining from using illegal drugs. The record reflects that Mother understood the conditions of her family service plan. The record reflects, however, that Mother did not complete the services in her plan including remaining drug-free, maintaining significant contact with her children, and complying with recommendations from the substance-abuse assessment.

To be sure, Mother testified that she had a stable home and had lived there for several months. She presented evidence in the form of pictures of her apartment at the time of trial showing that there was enough room for the children. Mother obtained psychosocial and substance-abuse assessments and had regular employment. During one of the trial recesses, almost a year after trial began, Mother began attending drug treatment classes. The factfinder may conclude, however, that a parent's changes shortly before trial are too late to have an impact on the best-interest determination. *See In re T.R.M.*, No. 14-14-00773-CV, 2015 WL 1062171, at *9 (Tex. App.—Houston [14th Dist.] Mar. 10, 2015, no pet.) (mem. op.); *In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied).

Mother repeatedly contradicted her own testimony about drug use. At one point she admitted using cocaine and marijuana. At another point she denied ever using marijuana and testified she took pills containing cocaine. Other than attend classes during trial Mother expressed little desire to seek treatment for illegal drug use. The evidence shows a pattern of Mother failing and refusing to seek treatment for her substance abuse. When faced with the choice of getting tested for drug use so that she could see her children or forfeiting visitation with them if she refused,

Mother refused to be tested and opted to forgo seeing her children rather than take actions to address her substance abuse.

The trial judge observed the witnesses, including Mother and caseworker Palmer; we did not. We are not able to discern critical nonverbal factors that are essential to credibility determinations, but the trial judge did. It was both the trial judge's prerogative and the trial judge's duty to assess the credibility and demeanor of the witnesses, weigh all the evidence, and make the dispositive best-interest determination. "Sympathy for a parent's self-inflicted plight, however, is no basis for abandoning our duties as detached arbiters of whether there is sufficient evidence supporting a factfinder's determinations where the contrary evidence depends on credibility determinations—the factfinder's exclusive domain." *In re C.V.L.*, 591 S.W.3d 734, 765–66 (Tex. App.—Dallas 2019, no pet. h.) (Whitehill, J., dissenting). The evidence recited above is both legally and factually sufficient to support the trial court's best-interest finding.

CONCLUSION

The trial court heard evidence of Mother's conduct that led to the Department's intervention as well as evidence of Mother's failure and refusal to seek help for drug use or engage in services to aid in the return of her children. Because Mother continued to use illegal drugs after her children were removed and while this case was pending, high-court authority calls us to conclude the evidence is legally sufficient to support the trial court's finding of endangerment. *See In re J.O.A.*, 283 S.W.3d at 345. An appellate court cannot reweigh the evidence on appeal, nor can it substitute its judgment of the children's best interest for the considered judgment of the trial court that decided the matter. In overturning the trial court's best-interest determination, the majority violates both of these principles. The Legislature has safeguarded the parent's fundamental interest by limiting the circumstances in which

the State's interest can overcome the parent's interest. *See* Tex. Fam. Code Ann. § 161.001. The Supreme Court of Texas further safeguarded the parent's interest by requiring courts of appeals to conduct an exacting review of the entire record when a parent challenges a termination order for insufficient evidence. *See In re C.H.*, 89 S.W.3d at 19. Based on the totality of the evidence, a reasonable fact finder could form a firm conviction or belief that termination of Mother's parental rights is in the children's best interest. Moreover, the evidence contrary to the trial court's finding that termination is in the best interest of the children is not so objectively overwhelming that the trial court could not reasonably decide that the Department met its burden of proof.

/s/     Ken Wise
        Justice

En Banc Court consists of Chief Justice Frost and Justices Christopher, Wise, Jewell, Bourliot, Zimmerer, Spain, Hassan, and Poissant. Justice Hassan authored the En Banc Majority Opinion, in which Justices Bourliot, Zimmerer, Spain, and Poissant join. Justice Wise authored an En Banc Dissenting Opinion in which Chief Justice Frost and Justices Christopher and Jewell join. Chief Justice Frost authored an En Banc Dissenting Opinion.